NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| MOHAMMED S., | ) |
| Appellant, | ) Supreme Court No. S-18393 |
| | ) |
| | ) Superior Court No. 4FA-20-01659 CI |
| v. | ) |
| | ) MEMORANDUM OPINION |
| ABEIR E., | ) AND JUDGMENT[*] |
| | ) |
| Appellee. | ) No. 1980 – August 9, 2023 |
| | ) |

Appeal from the Superior Court of the State of Alaska, Fourth Judicial District, Fairbanks, Paul R. Lyle, Judge.

Appearances: Mohammed S., pro se, Fairbanks, Appellant. Samuel G. Gottstein and Jahna M. Lindemuth, Cashion Gilmore & Lindemuth, Anchorage, and Teryn Bird, Interior Alaska Center for Non-Violent Living, Fairbanks, for Appellee.

Before: Winfree, Chief Justice, Maassen, Carney, Borghesan, and Henderson, Justices.

## I. INTRODUCTION

This appeal arises from the superior court's rulings in a divorce action involving allegations of domestic violence, child custody and support disputes, property division disputes, and disputed procedural rulings along the way. We affirm the superior court's rulings.

---

[*]     Entered under Alaska Appellate Rule 214.

## II. FACTS AND PROCEEDINGS

### Facts

Mohammed S. and Abeir E. married in Egypt in 2001.[1]  They signed an "Official Marriage Contract" under Egypt's traditional Islamic marriage laws, which included a "mahr" provision.[2]  The mahr required Mohammed to pay Abeir a single Egyptian pound in advance of the marriage, with a deferred payment of 12,000 Egyptian pounds (currently about $400).

Mohammed served in the U.S. Army, and the couple moved to Germany in 2002 and then to Fairbanks in 2007.  Over the years they had six children, three while in Germany and three while in Fairbanks.  Mohammed and Abeir became U.S. citizens, and Mohammed was honorably discharged from the military in 2010.

---

[1]  We use the parties' last initials to protect the family's privacy.

[2]  Under Islamic law, "marriage is a contract."  Nathan B. Oman, *How to Judge Shari'a Contracts:  A Guide to Islamic Marriage Agreements in American Courts*, 2011 UTAH L. REV. 287, 301 (2011) ("[A] Muslim marriage contract is not a premarital agreement — that is, an agreement made in contemplation of a later act that will bring the marriage into existence.  Instead the marriage contract *is* the marriage. There is no subsequent act that constitutes a final solemnization that brings the marriage into existence.").  "The standard Islamic marriage contract must contain deferred dower, called a mahr . . . ."  *Id.* at 302.  A mahr provision requires that "the husband must give something of value to the wife, part of which will be deferred until the husband's death or the couple's divorce."  Chelsea A. Sizemore, *Enforcing Islamic Mahr Agreements:  The American Judge's Interpretational Dilemma*, 18 GEO. MASON L. REV. 1085, 1085-86 (2011); *see also Mahr*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("A gift of money or property that must be made by a man to the woman he marries.  The parties agree to the mahr's amount and time of payment before marrying. If the time of payment is indefinite or if the mahr's outstanding balance is not paid sooner, the agreed amount or outstanding balance becomes due on divorce or the husband's death.").  Because a "mahr is . . . a mandatory requirement for all Muslim marriages," a marriage contract without mahr will have one that is judicially determined.  A "husband may not reduce the mahr," and "[e]ven upon the husband's death, the deferred mahr is paid from his estate before all other debts."  Sizemore, *supra*, at 1087-89.

In retirement Mohammed received Social Security disability benefits, veteran's disability benefits, and federal health insurance benefits that also covered Abeir and the children. Abeir worked as a school bus driver. Over the years the couple took out a mortgage to buy a family home and a second mortgage to buy a four-plex as an investment property. They also purchased an undeveloped lot on a lake. The family home, the four-plex, and the lake property were jointly titled in Mohammed's and Abeir's names, as were some other less valuable parcels of undeveloped property (with one exception, which was titled only in Mohammed's name). Mohammed earned a Master's in Business Administration from the University of Alaska Fairbanks in 2016, but did not return to work.

## A. Proceedings

### 1. Pretrial proceedings

Abeir applied for short-term and long-term domestic violence protective orders (DVPO) against Mohammed for herself and the children in early May 2020. Abeir's requests for short-term DVPOs were denied. Abeir and the children at first remained with Mohammed in the family home awaiting a hearing on the long-term DVPO requests, but in late May they moved into a domestic violence shelter operated by Interior Alaska Center for Non-Violent Living (IACNVL).

In summer 2020 Abeir filed a divorce complaint. Abeir accused Mohammed of domestic violence, sought application of a statutory presumption that a parent with a history of domestic violence may not have legal or physical custody of a child, and sought sole legal and primary physical custody of the children along with an award of child support and an equitable division of the marital estate. Mohammed, self-represented, responded in late July using a form document. He admitted that he and Abeir were Alaska residents and did not check boxes to indicate he believed jurisdiction in Alaska was improper. He sought primary physical custody of the children, asserting that Abeir could not safely care for the children because she previously had been hospitalized with "severe asthma in winter." He checked the box indicating he sought

the superior court's equitable division of the marital estate, but he also handwrote that "we have [an] official marriage contract," which he provided as an attachment.

The district court granted the children a long-term DVPO against Mohammed on August 10, but denied Abeir a long-term DVPO. The district court also entered a temporary custody and visitation order and directed the parties to raise any future concerns about custody and visitation with the superior court in the divorce case. Shortly thereafter Abeir secured free legal counsel through the IACNVL Legal Services Program, and Mohammed then moved for court-appointed counsel under *Flores v. Flores*.[3] At about this time the district court granted Abeir a long-term DVPO against Mohammed.

Without providing prior notice to Abeir or the superior court, Mohammed obtained a divorce certificate from an Egyptian civil registry office on October 20.[4] In

---

[3]   598 P.2d 893, 896 n.12 (Alaska 1979) (holding that Alaska Constitution guarantees court-appointed counsel for indigent litigants in child custody proceedings when opposing party is represented by public agency).

[4]   Under traditional Islamic law a "talaq divorce allows the husband to unilaterally divorce his wife without cause through oral or written pronouncement . . . [but] [t]he wife has no similar inherent right to unilateral divorce." Sizemore, *supra* note 1, at 1088. "As a practical matter, the delayed mahr is meant to act as a check upon the husband's otherwise unfettered power of talaq, requiring that he pay what amounts to a fine to his wife upon divorce." Oman, *supra* note 1, at 305. The events in this case are similar to one legal scholar's explanation of why talaq likely is not recognized under U.S. laws:

> When Muslim marriages in the United States break down, a husband from a country that recognizes the validity of talaq may seek to preempt American divorce proceedings by traveling to that country or to its consulate or embassy to perform talaq on his wife. The husband will then claim that the American court must recognize the foreign divorce and that the wife's claim to any marital property is limited to what would be available to her in his country of origin. While the Constitution requires that states give the judgments of sister states full faith and credit, American

early November Mohammed asked the superior court to confirm the Egyptian divorce. He then provided the Egyptian divorce certificate to the U.S. Army, which resulted in Abeir (but not the children) becoming unenrolled from Mohammed's federal health insurance. Abeir in turn moved to enforce a standing preliminary injunction prohibiting disposing of marital property without both parties' written consent.

On November 9 the superior court denied Mohammed's motion for a court-appointed attorney, concluding that he was not indigent and could afford to hire an attorney. The court estimated his annual income to be higher than relevant poverty guidelines and found that he had not established an inability to work, that he could produce additional income by renting two vacant units in the four-plex, and that he held equity in property which could be spent with the court's permission to pay for a divorce attorney.

On November 17 the superior court held an evidentiary hearing and issued an interim custody decision. A written decision followed the next week. The court considered evidence from the district court's previous long-term DVPO hearing along with new testimony and exhibits. The court found that Mohammed had "engaged in more than one act of domestic violence against his children" by physically assaulting and "mentally injur[ing]" them. The court applied the domestic violence presumption against Mohammed,[5] and assigned sole legal custody and primary physical custody to

---

recognition of foreign acts is a matter of comity. American courts have uniformly refused to recognize such opportunistic talaqs, holding that to do so would violate state and federal constitutional provisions of equal protection and due process. The presence ex ante of a marriage contract conforming to the requirements of Islamic law has not persuaded them to shift their analysis.

*Id.* at 312-13 (citations omitted).

[5] *See* AS 25.24.150(g) (creating rebuttable presumption that "a parent who has a history of perpetrating domestic violence against the other parent, a child, or a domestic living partner may not be awarded sole legal custody, sole physical custody,

Abeir. The court granted Mohammed supervised visitation, but only "as therapeutically recommended by the children's counselor." The court provided that Mohammed could obtain unsupervised visitation by completing domestic violence intervention and parenting education programs and then demonstrating that he had learned non-violent parenting techniques and understood how to implement them.

In a separate written order issued the same day the court refused to grant comity to enforce the Egyptian divorce decree, citing lack of due process for Abeir.[6] The court instead granted Abeir's motion to enforce the court's standing preliminary injunction. The court ruled that the portion of federal health insurance earned during the marriage was marital property and ordered that Mohammed seek reinstatement of Abeir's benefits pending a divorce decree.

Mohammed obtained private counsel in December. The parties stipulated to some issues, including: (1) setting Mohammed's interim child support at $1,413.60

---

joint legal custody, or joint physical custody of a child"); *see also* AS 25.24.150(h) (providing that parent has "history of perpetrating domestic violence" if "the court finds that . . . the parent has engaged in more than one incident of domestic violence").

[6] The United States Constitution's Full Faith and Credit Clause does not apply to a divorce obtained in a foreign country. U.S. Const. art. IV, § 1. State courts may recognize foreign divorces under the principal of comity, which applies when "the courts of one state or jurisdiction . . . give effect to the laws and judicial decisions of another state or jurisdiction, not as a matter of obligation, but out of deference and mutual respect." *John v. Baker*, 982 P.2d 738, 762 (Alaska 1999) (quoting *Brown v. Babbitt Ford, Inc.*, 571 P.2d 689, 695 (Ariz. 1977)). We have explained "that state courts should afford no comity to proceedings in which any litigant is denied due process." *Id.* at 763 (citing *Wilson v. Marchington*, 127 F.3d 805, 810 (9th Cir. 1997)); *see also DeHart v. Layman*, 536 P.2d 789, 790 (Alaska 1975) (providing that in context of child custody decrees "courts will ignore full faith and credit or abandon comity where the child's welfare so dictates"); 24A AM. JUR. 2d *Divorce and Separation* § 1022 (2018) ("A foreign divorce is not recognized by comity if it is obtained under circumstances that offend the public policy of the state in which recognition is sought. . . . Customs and laws that allow a husband, but not a wife, to divorce without any sort of judicial process are anathema to U.S. notions of due process, and a divorce obtained in that manner is not recognized by U.S. courts." (footnotes omitted)).

beginning January 1, 2021 (leaving open a dispute about his prior interim support obligation); (2) setting interim payments for maintenance of the marital estate; (3) establishing valuation and availability for distribution of certain assets and debts; (4) awarding Mohammed the four-plex (and requiring that it be refinanced in his name within six months or sold); and (5) establishing the marital coverture fraction applicable to Mohammed's federal health insurance benefits.[7]

After the superior court's interim custody order, but prior to the divorce trial, the State filed criminal assault charges against Mohammed with respect to the children for some of the incidents underlying the interim custody order. The court denied Mohammed's motion to bifurcate the child custody dispute from the divorce and property dispute and to leave the interim custody order in place pending resolution of the criminal matters. The court determined that his Fifth Amendment privilege from self-incrimination would have no real impact because the court already had ruled that he was required to overcome the domestic violence presumption before becoming eligible for custody, which he conceded he would not accomplish before trial. The court said that it would limit trial testimony to issues regarding only the divorce and property dispute, though noting that "[t]here may be evidence about the schedule for therapeutically-recommended supervised visits or whether the children's therapist is recommending contact, but that issue does not require [Mohammed] to testify about any domestic violence incident." The court explained that Mohammed could move for modification of the final custody order once he was able to overcome the domestic violence presumption.

---

[7]    *Gordon v. Gordon*, 425 P.3d 142, 147-48 (Alaska 2018) ("[T]he coverture fraction . . . . is used to determine the portion of a retirement medical benefit (or any other retirement benefit) that should be counted as marital property and the portion that should be counted as separate property.").

## 2. Trial proceedings and decisions

The following issues were disputed at the July 2021 trial: (1) final custody of the children; (2) interim child support for 2020; (3) valuation of the federal health insurance benefits; and (4) distribution of the marital estate. Mohammed conceded in his pretrial memorandum that the domestic violence presumption prevented him from obtaining custody until he overcame the presumption, but nonetheless sought immediate supervised visitation. Abeir asked the court to adopt the interim custody order as the final custody arrangement. Mohammed sought an equal distribution of the marital estate while Abeir sought a 60% - 40% distribution in her favor.

The children's therapist testified that the children would need therapy "off and on for a long period of time." She testified that the children "still don't feel like they can leave . . . the [domestic violence] shelter without fear of being kidnapped or running into their father." She described each child's trauma and treatment progress, and detailed the steps she believed Mohammed needed to follow to regain custody.

The parties' experts testified about valuing the marital portion of Mohammed's federal health insurance benefits. Mohammed's expert testified to a value of $85,563, while Abeir's expert testified to a value of $104,321.

The superior court placed an oral custody decision on the record in late July, effectively with the same terms as the interim custody order. The court took the remaining issues under advisement. Mohammed's attorney then withdrew from representing him. Proceeding self-represented, Mohammed moved for reconsideration of the custody decision and asked to reopen the record. The court declined to reconsider its custody decision. Mohammed then moved to submit additional evidence, including documents he claimed his attorney had shared with Abeir's attorney but had not entered into evidence at trial.[8] The court denied this motion, explaining that the record was

---

[8] *Cf.* Alaska R. Civ. P. 26(a)(3)(C) (requiring pretrial disclosure of "each document [that] the party may offer if the need arises").

closed, a custody decision was on the record, and the remaining property and child support issues were under advisement.

The superior court issued written orders on November 3, including a divorce decree. The court's final written custody order assigned sole legal custody and primary physical custody to Abeir and reiterated that before Mohammed could obtain contact, unsupervised visitation, or shared custody he needed to complete parenting and domestic violence treatment programs, demonstrate what he had learned, and establish that contact was therapeutically recommended.

The superior court awarded Abeir $5,779.20 in back child support for 2020. The court granted Mohammed a child support credit against that amount for Social Security children's insurance benefit (CIB) payments (based on Mohammed's disability status) paid to Abeir. The court denied Mohammed a child support credit for payments he claimed to have made to preserve the marital estate.

The superior court divided the marital estate 56% - 44% in Abeir's favor as the economically disadvantaged spouse. The court awarded the four-plex to Mohammed, as the parties had stipulated. The court valued the marital portion of the federal health insurance benefits at $101,360 (averaging the experts' valuations after making corrections for certain valuation mistakes), which it also awarded to Mohammed. The court awarded proceeds from the sale of the family home to Abeir. The court also awarded Abeir the lake property. Regarding the other undeveloped properties in the marital estate, the court ordered one to be sold and the proceeds split, and the others were awarded to Abeir. In total net equity, Mohammed received $213,530 and Abeir received $271,784.

### 3. Post-trial proceedings

In November Mohammed moved for reconsideration of the superior court's child custody, child support, and property distribution orders. He claimed that his attorney "betray[ed]" him by intentionally hiding documents from the court. He

argued that his federal health insurance was not marital property because he had joined the military before marrying Abeir. He also moved again for court-appointed counsel.

In December Abeir moved to compel Mohammed to release the proceeds from the sale of the family home. Mohammed opposed that motion, arguing that because his federal health insurance was not marital property, the superior court had improperly distributed the marital estate. Abeir also moved for reconsideration of the court's child support order, claiming that the court had erred by deducting the CIB payments from the 2020 child support award because she had not begun receiving them until June 2021.

In March 2022 the court denied reconsideration of its custody decision and its distribution of the marital estate. The court granted reconsideration of the 2020 child support calculation to determine whether it had improperly credited Mohammed for the CIB payments and set a hearing. The court also granted Mohammed a hearing to determine whether he had become indigent for the purpose of appointing counsel. In a separate order the court granted Abeir's motion to compel release of the funds from the sale of the family home.

In early April Mohammed moved for the superior court to be "fair & not biased." He alleged that the court had favored Abeir's attorney because she was employed by IACNVL and that the court ignored his exhibits, motions, and affidavits "as if they did not exist." He further alleged that the court had granted motions Abeir had not made, refused to let Mohammed finish his testimony, condoned lies by Abeir's attorney, and "took it personal" when Mohammed obtained the Egyptian divorce decree and provided it to the U.S. Army, resulting in Abeir losing her health insurance coverage. The court treated Mohammed's motion as a motion for recusal based on judicial bias and canceled scheduled hearings on the child support and court-appointed counsel issues pending resolution of the recusal motions. The court later denied recusal, finding no actual bias nor any appearance of bias, and another superior court judge later affirmed the court's denial of the recusal motion.

### 4.     Appeal

Mohammed challenges the superior court's decisions regarding:  (1) the November 2020 denial of court-appointed counsel; (2) child custody; (3) child support; (4) the property distribution; and (5) non-recusal.  Due to the timing of the appeal, the superior court's ultimate reconsideration decisions on the 2020 interim child support and the 2022 court-appointed counsel motion are not before us in this appeal.

## III.     DISCUSSION

### A.     November 2020 Order Denying Court-Appointed Counsel

Mohammed correctly notes we have held that when one party in a child custody matter is represented by a "public agency," the other party, if indigent, is entitled to court-appointed counsel.[9]  After Abeir became represented by IACNVL's attorney, Mohammed claimed to be indigent and sought court-appointed counsel.  Under AS 44.21.410(a)(3) the Office of Public Advocacy (OPA) is the state agency responsible for providing court-appointed counsel in this context.[10]    Indigency

---

[9]     *Flores v. Flores*, 598 P.2d 893, 896 n.12 (Alaska 1979) (holding that due process requires court-appointed counsel for indigent party in child custody matter when opposing party is represented by a public agency and that Alaska Legal Services Corporation is a public agency in this context); *see also In re Alaska Network on Domestic Violence & Sexual Assault*, 264 P.3d 835, 839-40 (Alaska 2011) (holding that nonprofit legal aid entity qualified as public agency in part because it received over 99% of its funding from Department of Justice's Office on Violence Against Women and other federal and State of Alaska grants); *In re Office of Public Advocacy*, 514 P.3d 1281, 1286-88 (Alaska 2022) (applying *Flores* when private attorney represented party through Alaska Legal Services Corporation volunteer pro bono program).  *But see id.* at 1288-90 (Borghesan, J., concurring) (questioning *Flores*'s ruling that in this context non-governmental entity may be public agency merely by receiving public funds).

[10]     *See, e.g.*, *Thomas G. v. Sonya G.*, No. S-15123, 2015 WL 3935903, at *4 (Alaska June 24, 2015) ("Alaska Statute 44.21.410(a)(4) requires that the Office of Public Advocacy 'provide legal representation . . . to indigent parties in cases involving child custody in which the opposing party is represented by counsel provided by a public agency.' ").  Alaska Statute 44.21.410(a)(4) was renumbered to subsection (a)(3) in 2022.  Ch. 21, § 3, SLA 2022.

determinations for court-appointed OPA counsel generally are governed by Alaska Administrative Rule 12(c)(2), providing that "[a] person is indigent if the person's income does not exceed the maximum annual income level established to determine eligibility for representation by the Alaska Legal Services Corporation."[11] But courts do not myopically consider only income to determine indigency, as available assets are another consideration. For example, in one case we agreed that a father was not indigent because he had "$200,000 to $300,000 in marital assets" and "was given ample opportunity to ask the court to allow him to liquidate [marital] assets but he chose not to do so."[12]

In early November 2020 the superior court held an evidentiary hearing on Mohammed's request for court-appointed counsel. Mohammed did not prepare a transcript of that hearing for his appeal, but in a written order the court stated that Abeir was represented by IACNVL and Mohammed would be eligible for court appointed counsel if he were indigent. The court thus must have determined that IACNVL was a "public agency" under *Flores*, but it did not explain the basis for that determination. The court did, however, outline why it found Mohammed was not indigent and could afford to hire a lawyer.

The court said it was not persuaded that Mohammed, an accountant with a master's-level degree in finance (with a concentration in capital markets) obtained just a few years earlier (and after his military discharge), was unable to work. The court identified nearly $70,000 in funds obtained by Mohammed to date in 2020, including his Social Security and veterans' disability payments, the parties' 2020 tax refund, the

---

[11]     Alaska Admin. R. 12(c)(2) ("For appointments of the office of public advocacy under this rule, other than an appointment required because of a conflict of interest with the public defender agency, a person is indigent if the person's income does not exceed the maximum annual income level established to determine eligibility for representation by the Alaska Legal Services Corporation.").

[12]     *Jordan v. Jordan*, 983 P.2d 1258, 1263 (Alaska 1999).

family members' permanent fund dividends, the family's federal Covid support payments, Abeir's unemployment benefits, and the duplex rental income. The court noted that not all the rental units were rented and that there was considerable equity in the parties' real property, some of which could be used to pay for an attorney. On this basis the court denied Mohammed's motion for court-appointed counsel.

The thrust of Mohammed's challenge to the superior court's finding that he was not indigent is, essentially, that the court erred by believing Abeir's evidence and disregarding his own evidence. But we review the court's finding only for clear error, which exists "when we are left with a definite and firm conviction based on the entire record that a mistake has been made."[13] And we give deference to the court's finding when it is based on hearing the parties' testimony because the court has had an opportunity to gauge the parties' demeanor and credibility.[14] Based on the record before the superior court when it denied Mohammed's motion, and also recognizing that Mohammed ultimately received over $210,000 in net equity from the marital estate, we cannot say the superior court clearly erred in November 2020 by finding Mohammed was not indigent and had the resources to pay for legal representation for the child custody dispute.

## B.    Child Custody Decision

### 1.    Domestic violence presumption

Alaska Statute 25.24.150(g) creates a "rebuttable presumption" that a parent with a "history of perpetrating domestic violence" may not obtain legal or

---

[13]    *Aubert v. Wilson*, 483 P.3d 179, 186 (Alaska 2021) (quoting *Pasley v. Pasley*, 442 P.3d 738, 744 (Alaska 2019)).

[14]    *Limeres v. Limeres*, 320 P.3d 291, 296 (Alaska 2014) ("The trial court's factual findings enjoy particular deference when they are based 'primarily on oral testimony, because the trial court, not this court, judges the credibility of witnesses and weighs conflicting evidence.' " (quoting *Sheffield v. Sheffield*, 265 P.3d 332, 335 (Alaska 2011))).

physical custody of a child. Alaska Statute 25.24.150(h) provides that a parent who commits either "more than one incident of domestic violence" or "one incident of domestic violence" causing "serious physical injury" has a "history of perpetrating domestic violence." "We generally require detailed domestic violence findings when a party alleges that the domestic violence presumption should apply."[15] The superior court must make "findings with sufficient specificity" to permit meaningful appellate review of "both the grounds for its decision and its application of the law to the facts."[16] Although the superior court's factual findings are reviewed for clear error, whether the superior court's findings are sufficient to support a determination of a parent's "history of perpetrating domestic violence" is a legal question to which we apply our independent judgment.[17]

Mohammed seems to argue that the superior court's domestic violence findings from the November 2020 evidentiary hearing on interim custody were clearly erroneous and its application of the domestic violence presumption was thus based in legal error. He contends that the court ignored his evidence, that Abeir coached the children to falsely accuse him of domestic violence, and that Abeir and her attorney engaged in wrongful conduct in the litigation.

The superior court independently reviewed the evidence presented at the August 2020 hearing (which had resulted in a long-term DVPO against Mohammed as to the children). At that hearing the guardian ad litem (GAL) assigned to the case to act in the children's best interests reported that she had separately interviewed the four oldest children, who "all disclosed in separate detail and separate incidents" physical abuse by Mohammed. Two children then testified that Mohammed had beaten them

---

[15]  *Bruce H. v. Jennifer L.*, 407 P.3d 432, 439 n.34 (Alaska 2017).

[16]  *Solomon v. Solomon*, 420 P.3d 1234, 1242 (Alaska 2018) (quoting *Price v. Eastham*, 128 P.3d 725, 731 (Alaska 2006)).

[17]  *Id.* at 1241.

and their siblings. That testimony was supported by two recordings. In the first recording Mohammed screams at one of the testifying children and sounds like slapping or hitting are clearly audible. The child testified that the sounds were Mohammed hitting her, while Mohammed later testified that it was him slamming his hand on the table. In the second recording Mohammed screams at two other children. The GAL said that the recordings and the children's testimony were consistent with what she had learned in her previous interviews.

At the November hearing the GAL repeated her recommendation from the August hearing "that the children remain in the custody of [Abeir] and have visitation with their father as therapeutically recommended." The court allowed the parties to question the GAL. During this questioning the GAL said she did not believe Abeir had coached the children to falsely report abuse and repeated that the children's descriptions of abuse were consistent with one another.

Contrary to Mohammed's assertions, the superior court did not refuse to hear any of his witnesses at the November hearing. And the court admitted all of his exhibits that were not irrelevant or did not contain inadmissible hearsay evidence. Mohammed makes no argument to us that any specific evidentiary rulings were erroneous.

The superior court made detailed findings and conclusions. The court found the two children's August 2020 testimony credible, findings we do not lightly set aside.[18] The court identified numerous incidents of domestic violence perpetrated on the children, finding that Mohammed "hit all of his children, slapping them, punching them, pulling their hair and ears, and hitting them with items and has punched and thrown things at them constituting at least fourth-degree assault under

---

[18]     *See Snider v. Snider*, 357 P.3d 1180, 1190 (Alaska 2015) (explaining that in custody case we give "particular deference" to trial court's factual findings based on oral testimony credibility determinations).

AS 11.41.230(a)(1)." Referring to and quoting language from a statute providing that reasonable parental discipline of children is justification for what otherwise might be criminal conduct, the court found Mohammed's actions "well beyond the use of 'reasonable and appropriate nondeadly force' . . . to discipline his children, thus obviating the defense of reasonable discipline."[19]

The superior court then detailed specific instances of domestic violence, finding credible the testimony about Mohammed striking specific children at specific times and taking steps to try to hide the children's injuries, such as keeping them out of school. The court found credible the two children's testimony that their mother had not coached them to testify. The court found credible Abeir's November testimony that the children are afraid of Mohammed. The court explained that it gave Mohammed's witnesses less weight because they had never seen how he treated the children when only family members were around. Based on the audio recordings made by the children, the court found unpersuasive Mohammed's testimony that he only yelled at the children but did not hit them. And the court found that his tirades on the audio tapes "constitute fourth-degree assault under AS 11.41.230(a)(3) — 'words or other conduct . . . recklessly plac[ing] another person in fear of imminent physical injury.' "

The superior court found that Mohammed had engaged in more than one act of domestic violence against his children. The court then applied the presumption of AS 25.24.150(g) and AS 25.24.150(h), concluding that he was ineligible to have legal or shared physical custody of the children. The court concluded that he could have supervised visitation with the children under AS 25.24.150(j), but, because he had both physically and mentally injured his children, he could not have unsupervised visitation. The court provided for "supervised visitation with the children as therapeutically recommended by the children's counselor." And the court outlined

---

[19]     *See* AS 11.81.430(a)(1).

steps Mohammed would have to take to move to unsupervised visitation or shared physical custody.

The record fully supports the superior court's factual findings about Mohammed's abusive treatment of his children and those findings fully support the superior court's application of AS 25.24.150(g), (h), and (j). We reject Mohammed's contentions to the contrary.

### 2. Final custody decision

Alaska Statute 25.24.150(c) provides that the superior court "shall determine custody in accordance with the best interests of the child" considering nine statutory factors.[20] "While a court determining custody must always consider each of these statutory factors, it need not refer to all of them in explaining its custody decision."[21] The court need only discuss those factors that the court finds relevant considering the evidence in the case.[22]

The bulk of the superior court's custody decision concerned the seventh factor — domestic violence. Because the court previously had applied the domestic violence presumption against Mohammed, he was ineligible for legal or shared physical

---

[20] The factors include: (1) the child's physical, emotional, mental, religious, and social needs; (2) each parent's capability and desire to meet the child's needs; (3) the child's preference, if meaningful; (4) the love and affection between the child and each parent; (5) the length of time the child has lived in a stable, satisfactory environment and the desirability of maintaining continuity; (6) each parent's willingness and ability to facilitate and encourage a close, continuing relationship between the other parent and the child, except that the court may not consider this if one parent shows that the other parent has engaged in domestic violence against the parent or a child and that a continuing relationship with the other parent will endanger the parent's or child's health or safety; (7) evidence of domestic violence, child abuse, or child neglect or a history of violence between the parents; (8) evidence of parental substance abuse that directly affects the emotional or physical well-being of the child; and (9) any other pertinent factors. AS 25.24.150(c)(1)-(9).

[21] *Park v. Park*, 986 P.2d 205, 207 (Alaska 1999).

[22] *Id.*

custody until he overcame that presumption.[23] Mohammed appears to argue that he had overcame the domestic violence presumption by attending parenting classes. But the court found that he had failed to demonstrate how the classes "actually addressed domestic violence." And even if he had completed the requisite classes, the court's previous custody order required him to also establish that visitation was therapeutically recommended. At trial the children's therapist testified that Mohammed had not done enough to warrant such a recommendation, and she detailed the steps he still needed to complete. We see nothing in the record to otherwise suggest his actions after the interim custody order overcame the presumption, and we conclude that the superior court did not abuse its discretion by considering this as a factor in its final custody decision.

The superior court considered additional factors, which it discussed by referencing the children's therapist's testimony. Under the first and second factors the court determined that Mohammed was willing but "not presently capable" of caring for the needs of his children based on the children's fear of him. Under the third factor the court found that three of the children were "mature enough to form a preference, and all three prefer not to have contact with their . . . father." Under the fourth factor the court found no evidence that the children did not love their father, but it found that "[the children's] affection for their father . . . [was] significantly diminished due to the fear they have of him." Under the fifth factor the court found that the children's "mother is the parent [with whom] they have a personal relationship" and that Mohammed had "continued to undermine the children's emotional stability" by repeatedly stalking

---

[23]   AS 25.24.150(j) (providing that court shall allow only supervised visitation by a parent against whom it has applied the domestic violence presumption); AS 25.24.150(h) (providing that "[t]he [domestic violence] presumption may be overcome by a preponderance of the evidence that the perpetrating parent has successfully completed an intervention program for batterers, where reasonably available, . . . and that the best interests of the child require that parent's participation as a custodial parent because . . . of other circumstances that affect the best interests of the child").

them. The court found that the sixth factor did not apply because Mohammed had engaged in domestic violence. The court found no evidence of substance abuse under factor eight. The court concluded its analysis by noting that "[t]here are no other factors that the court considers pertinent." The court's analysis thus properly considered all relevant factors.

"While the 'court cannot assign disproportionate weight to particular factors while ignoring others, it has considerable discretion in determining the importance of each statutory factor in the context of a specific case and is not required to weigh the factors equally.' "[24] The superior court based its custody decision on explicit review of all the relevant factors. The court's consideration of the seventh factor was not disproportionate because the domestic violence presumption preempted the court from assigning physical or legal custody to Mohammed until he overcame the presumption.[25] We thus conclude that the court did not err or abuse its discretion in connection with its final custody decision.

## C. Child Support Decision

### 1. Mohammed's Social Security disability payments

Mohammed argues that the superior court erred by including his Social Security disability payments in his child support income calculation. He asserts that only his veteran's disability payments should have been included.

Parents have a legal duty to support their children starting from the date

---

[24] *Georgette S.B. v. Scott B.*, 433 P.3d 1165, 1171 (Alaska 2018) (quoting *Judd v. Burns*, 397 P.3d 331, 339-40 (Alaska 2017)).

[25] *See Borchgrevink v. Borchgrevink*, 941 P.2d 132, 141 (Alaska 1997) (affirming custody decision when domestic violence was factor "most strongly weighed in favor of one parent," other factors were "largely in balance," and controlling and assaultive behavior and domestic violence were "controlling factors" in custody determination).

of separation.[26]  Child support generally is calculated under Alaska Civil Rule 90.3 as a percentage of the non-custodial parent's "adjusted annual income," which is the "parent's total income from all sources" minus certain "mandatory deductions."[27]  The comment to Rule 90.3 lists the relevant sources of "total income" as including "[S]ocial [S]ecurity," "veterans' benefits," and "disability benefits" such as "periodic disability payments."[28]

It does not appear that Mohammed ever disputed including his Social Security disability payments in his income calculation while litigating his child support obligations.  He does not point to any objection he may have made in the superior court.  In July 2020, for purposes of the court's entering an interim child support order, he submitted a child support affidavit that counted both the Social Security and veteran's disability payments as income.  And he later submitted a memorandum to the court asserting that, based on his stated income, $1,413.60 should be his interim monthly child support.  That is what the superior court ordered.  He filed an updated child support affidavit before trial, for the third time including both disability payments as income for purposes of a child support order.

Mohammed also does not point to any legal authority supporting his argument to us.  As noted above, Rule 90.3 contemplates including Social Security disability payments in a "total income" calculation.  And we have regularly approved

---

[26]    *Christopher D. v. Krislyn D.*, 426 P.3d 1118, 1123 (Alaska 2018) (noting this court has "repeatedly recognized that child support should be calculated from the date of separation"); Alaska R. Civ. P. 90.3 cmt. I(B) ("Typically, the obligation to pay child support begins on the child's date of birth if the parents are not living together, or on the date the parents stop living together if separation is after the birth of the child.").

[27]    Alaska R. Civ. P. 90.3(a)(1)(A)-(F) (providing deductions for certain voluntary retirement contributions, child support from different relationships, "in-kind support," "work-related" child care expenses, and health insurance premiums).

[28]    *Id.* at cmt. III(A).

including Social Security disability payments when calculating child support.[29] Mohammed likely waived his argument by failing to raise it in the superior court,[30] but we nonetheless conclude on de novo review that it was not legal error to include his Social Security disability payments as income when establishing a final child support order.[31]

### 2. Children's Social Security disability payments

Mohammed also challenges the superior court's treatment of the CIB payments, totaling nearly $600/month, made to him on behalf of the six children. Under our case law "CIB payments should be counted as income to the noncustodial parent for purposes of calculating child support under Civil Rule 90.3."[32] But if CIB payments attributable to a noncustodial parent are paid to the custodial parent, then the "parent who is required to pay support to a child under Civil Rule 90.3 is entitled to child support credit for [S]ocial [S]ecurity payments the child receives on the parent's behalf."[33] In this case at some point Social Security began making the CIB payments

---

[29] *See Miller v. Miller*, 890 P.2d 574, 577 (Alaska 1995) (noting that "no theoretical basis for distinguishing between" Social Security disability and Social Security retirement exists in child support context).

[30] *See Ivy v. Calais Co. Inc.*, 397 P.3d 267, 275-76 (Alaska 2017) (holding argument not preserved for appeal when not raised at trial).

[31] *Mitchell v. Mitchell*, 370 P.3d 1070, 1076 (Alaska 2016) (explaining that "[w]hether the superior court applied the correct legal standard to its child support determination is a question of law that we review de novo" as is "[t]he interpretation of Alaska Civil Rules governing child support orders" (first quoting *Limeres v. Limeres*, 320 P.3d 291, 295 (Alaska 2014) (alteration in original); and then quoting *J.L.P. v. V.L.A.*, 30 P.3d 590, 594 (Alaska 2001) (alteration in original))).

[32] *Miller*, 890 P.2d at 578 (reasoning that children's insurance "benefits are essentially earnings derived . . . from . . . past [S]ocial [S]ecurity contributions").

[33] *Id.* at 575, 578 (reasoning that "[g]iven the broad definition of income under Civil Rule 90.3, and in order to avoid granting a windfall to [the noncustodial parent], [this court] find[s] it necessary to include [S]ocial [S]ecurity benefits payable

directly to Abeir. As discussed earlier the superior court granted a post-trial reconsideration motion on its award for unpaid 2020 interim child support and set a hearing — later cancelled when Mohammed sought the superior court's recusal — to determine exactly when that change was effected and how that would affect the unpaid interim child support award.[34]

Mohammed asserts that it is unfair, and essentially a double payment, to have the CIB payments considered as his income when the payments are made directly to Abeir. He does not point to anything in the record reflecting that he made this argument to the superior court before or during trial. But to the extent he argues to us that the superior court legally erred by including the CIB payments in his income to calculate support and then crediting his child support obligation by the amount of the CIB payments made directly to Abeir — which we review independently[35] — he is wrong.[36]

### 3. Denial of credit for other payments

Mohammed argues that the superior court erred by not giving him credit against his 2020 interim child support obligation for paying down marital debts, paying utility bills, and purchasing heating fuel for the family home and four-plex. Whether to credit a child support obligation is within the superior court's discretion, provided the decision is supported by sufficient findings of fact and conclusions of law.[37] Credit

---

to [the custodial parent] on [the noncustodial parent's] behalf as income for purposes of the Rule 90.3 calculation of income").

[34] The superior court said that the change occurred in June 2020 and therefore gave Mohammed credit for the payments through the end of the year. Abeir moved for reconsideration, asserting that the superior court made a mistake and that the change took place in June 2021. Mohammed states in his briefing to us that the change was made in June 2021.

[35] *See supra* note 31.

[36] *See supra* notes 32-33.

[37] *Dundas v. Dundas*, 362 P.3d 468, 482 (Alaska 2015).

is limited to "support given directly to the custodial parent or the children"[38] during the "period between separation and the award of interim child support, where no support order or clear agreement as to the parties' support obligations exists."[39]  For example, a court may award credit for money spent "directly on the children for food, clothes[,] and medical care."[40]

Mohammed had the burden to prove by clear and convincing evidence that a credit on his child support obligation would avoid a manifest injustice.[41]  At one point the superior court asked whether Mohammed was "seeking credit for paying marital debt with marital money post-separation."  His attorney responded, "No . . . [m]arital money got spent on marital debt, and there was plenty of that."  The court explained that Mohammed had failed to prove how paying the bills for the family home had "benefitted his children while they lived exclusively in the [domestic violence] shelter."  The court also noted that he may have made payments using Abeir's "pay checks, her unemployment income, and the PFD checks for [her] and the children."  The court's decision — that Mohammed did not make support payments warranting a credit — was not an abuse of discretion because Mohammed failed to demonstrate how his payments directly supported Abeir and the children such that there was manifest injustice.

---

[38]     *Id.* at 482-83 (limiting credit to "marital expense payments that *actually went to the children's needs and interests* as opposed to [the parents'] joint marital debt" (emphasis added)).

[39]     *Jenkins v. King*, No. S-9804, 2002 WL 31492591, at *2 (Alaska Nov. 6, 2002).

[40]     *Ogard v. Ogard*, 808 P.2d 815, 816-17 (Alaska 1991).

[41]     *See* Alaska R. Civ. P. 90.3(c)(1) (placing burden on party seeking credit to prove by clear and convincing evidence that awarding credit would avoid manifest injustice).

## D.    Final Marital Estate Distribution Decision

### 1.    Marriage contract

Mohammed argues that the Egyptian marriage contract is a prenuptial agreement limiting Abeir's property award to 12,000 Egyptian pounds.[42]  Abeir argues that Mohammed waived this argument because he did not raise it at trial.  "An argument is ordinarily not preserved for appeal if it was not raised below, or if it was only raised after the party filed a motion for reconsideration."[43]  We may nonetheless consider new arguments on appeal if they:  "(1) are not dependent on new facts, (2) are closely related to [the party's] trial pleadings and (3) could have been gleaned from the pleadings."[44]  We have on occasion relaxed this standard for self-represented litigants.[45]

Prior to his appeal Mohammed never argued that the Egyptian marriage contract should be treated as a prenuptial agreement.  He mentioned the Egyptian marriage contract in his answer and counterclaim, but he checked the box indicating that he sought the court's equitable distribution of the marital estate.  His attorney never raised the issue at trial.  Mohammed testified at trial that the mahr provision was a "dowry" and not a prenuptial agreement.  The first time Mohammed claimed that the

---

[42]    *See Andrew B. v. Abbie B.*, 494 P.3d 522, 529-30 (Alaska 2021) (explaining that "[a] prenuptial agreement is a contract . . . so normal rules of contract interpretation apply" but, unlike contracts, "prenuptial agreements are enforceable only 'if certain standards of "fairness" are met' " (quoting *Brooks v. Brooks*, 733 P.2d 1044, 1049 (Alaska 1987))); *see also Brooks*, 733 P.2d at 1050-51 (recognizing that "prenuptial agreements legally procured and ostensibly fair in result are valid and can be enforced").

[43]    *Ivy v. Calais Co. Inc.*, 397 P.3d 267, 275 (Alaska 2017).

[44]    *Zeman v. Lufthansa German Airlines*, 699 P.2d 1274, 1280 (Alaska 1985).

[45]    *Smith v. Sampson*, 816 P.2d 902, 906 (Alaska 1991) (relaxing requirement that all claims be included in appellant's points on appeal).  *But see Pieper v. Musarra*, 956 P.2d 444, 446 (Alaska 1998) ("Notwithstanding the leeway given to pro se litigants, the requirement that an issue be preserved by being presented in the superior court arises out of notions of judicial finality and efficiency, as well as fairness to the opposing party.").

Egyptian marriage contract was a prenuptial agreement was after trial — and after the court had denied his reconsideration motion — in his motion for the court to be "fair & not biased." It is impossible to evaluate this claim on the record created in the superior court because no relevant evidence was presented. We thus conclude that the argument has been waived.

### 2. Marital property characterizations[46]

"Marital property includes all property acquired during the marriage" except property acquired with separate property that is kept separate during marriage and inherited property.[47] "Premarital separate property may become marital through transmutation," occurring when conduct demonstrates a spouse's intent to treat that spouse's separate property as marital.[48] Mohammed argues that the superior court mischaracterized his government health insurance as marital property because he became eligible for it before marrying Abeir. He also claims that he purchased the family home, four-plex, and other properties with separate funds that he earned before marrying Abeir.

---

[46] *See Layton v. O'Dea*, 515 P.3d 92, 101 (Alaska 2022) (providing that we review "characterization of property as separate or marital for clear error with respect to any '[u]nderlying factual findings as to the parties' intent, actions, and contributions to the marital estate,' and de novo with respect to 'whether the [superior] court applied the correct legal rule.' " (alterations in original) (quoting *Beals v. Beals*, 303 P.3d 453, 459 (Alaska 2013))); *Odom v. Odom*, 141 P.3d 324, 330 (Alaska 2006) (providing that we review "distribution of property under the abuse of discretion standard and will reverse that distribution if it is clearly unjust").

[47] *Pfeil v. Lock*, 311 P.3d 649, 653 (Alaska 2013).

[48] *Id.*; *Aubert v. Wilson*, 483 P.3d 179, 188 (Alaska 2021) ("Transmutation 'occurs when one spouse intends to donate separate property to the marital estate and engages in conduct demonstrating that intent.' " (quoting *Pasley v. Pasley*, 442 P.3d 738, 750 (Alaska 2019))).

Government health insurance benefits earned during a marriage are marital property.[49] Mohammed stipulated in the superior court to the coverture fraction applicable to his government health insurance benefits, thus agreeing that the portion earned during marriage was marital property. We see no legal or factual error in the court's characterization of the marital portion of the benefits as marital property.

All the properties in the marital estate except one were jointly titled in Mohammed's and Abeir's names. They stipulated to selling the sole property titled in Mohammed's name and applying its proceeds to the mortgage on the family home. They agreed that the remaining properties were marital property subject to the court's equitable distribution. We have held that "placing the property in joint title . . . is *presumptive* evidence of [marital] intent and shifts the burden of proof to the owning spouse."[50] Had Mohammed argued at trial that the jointly titled properties actually were his separate property, the superior court likely would have required him to overcome this presumption at trial. But he did not make this argument and expressly agreed that the properties were marital. We see no legal or factual error in the court's characterization of the properties as marital property.

---

[49] *Burts v. Burts*, 266 P.3d 337, 341, 343 (Alaska 2011) (holding that federal TRICARE health insurance is marital property that can be "objectively valued" and that state courts are not preempted from considering TRICARE in marital property divisions); *Horning v. Horning*, 389 P.3d 61, 64 (Alaska 2017) ("We reaffirm *Burts* and hold that [insured spouse's] post-retirement TRICARE benefit is marital property to the extent that it was earned during the marriage."); s*ee also Grove v. Grove*, 400 P.3d 109, 114 (Alaska 2017) (holding that characterizing all of insured spouse's TRICARE benefits as marital property was clearly erroneous because insured spouse entered military six months before marriage, remanding for recalculation of portion of insured spouse's TRICARE benefits earned only during marriage).

[50] *Kessler v. Kessler*, 411 P.3d 616, 620 (Alaska 2018) (emphasis in original).

### 3. Marital property valuation

Mohammed argues that the superior court miscalculated the value of his government health insurance benefits, although it appears his argument is that because the benefits are not marital, there should be no value to them for purposes of a property distribution. Abeir counters that the court properly based its valuation on the parties' expert witness testimony. We have instructed superior courts "to rely on expert testimony and value [post-retirement medical] benefits consistent with Alaska law."[51]

Each expert's estimate was based on a premium subsidy calculation.[52] The court found Abeir's expert more reliable because: (1) Mohammed's expert used the mortality table for a 51-year-old but Mohammed was 54; (2) Mohammed's expert used mortality tables from 2017 although updated tables were available for 2020; (3) Mohammed's expert used inaccurate inflation estimates; and (4) Abeir's expert provided corrected tables for government retirees with health care benefits. After corrections the difference between the two experts' valuations was less than $6,000, and the court averaged those valuations to arrive at its valuation. Given the evidence presented by the parties, we conclude that the superior court's factual determination of the value of the health insurance benefits is not clearly erroneous.

### 4. Marital property distribution

Mohammed asks us to award him all of the marital estate except for $110,000, which he asserts was Abeir's equity in the family home from her contributions to mortgage payments. He argues that the superior court was prohibited from awarding Abeir a 56% - 44% split because she had asked for a 50% - 50% split. He claims that the court ignored his disability, which he claims prevents him from working. Abeir responds that the court considered the statutorily mandated factors and

---

[51] *See Wilkins v. Wilkins*, 440 P.3d 194, 197 (Alaska 2019).

[52] *See Hansen v. Hansen*, 119 P.3d 1005, 1016 (Alaska 2005) (describing premium subsidy calculation method).

settled on a division it found equitable considering the parties' respective circumstances.

The equitable division process begins with "[t]he starting presumption . . . that an equal division is the most equitable."[53] "But an unequal allocation can be 'condoned when it is justified by relevant factors identified in the findings of the court.' "[54] Courts consider the factors enumerated in AS 25.24.160(a)(4)(A)-(I):

> (1) the length of the marriage and station in life of the parties during the marriage; (2) the age and health of the parties; (3) the earning capacity of the parties, including their educational backgrounds, training, employment skills, work experiences, length of absence from the job market, and custodial responsibilities for children during the marriage; (4) the financial condition of the parties, including the availability and cost of health insurance; (5) the conduct of the parties, including whether there has been unreasonable depletion of marital assets; (6) the desirability of awarding the family home, or the right to live in it for a reasonable period of time, to the party who has primary physical custody of children; (7) the circumstances and necessities of each party; (8) the time and manner of acquisition of the property in question; and (9) the income-producing capacity of the property and the value of the property at the time of division.[55]

Courts may also consider other relevant factors as long as they are supported by factual findings "sufficient to indicate a factual basis for the conclusion reached."[56]

---

[53] *Dunmore v. Dunmore*, 420 P.3d 1187, 1193 (Alaska 2018).

[54] *Burts*, 266 P.3d at 348 (quoting *Hayes v. Hayes*, 756 P.2d 298, 300 (Alaska 1988)).

[55] These factors are also referred to as the "*Merrill* factors" because AS 25.24.160(a)(4) codified the factors that this court first listed in *Merrill v. Merrill*, 368 P.2d 546, 547-48 n.4 (Alaska 1962).

[56] *Pfeil v. Lock*, 311 P.3d 649, 653 (Alaska 2013).

As an initial matter the record reflects that Abeir requested a 60% - 40% split at trial, not a 50% - 50% split as Mohammed claims. In her pretrial memo she sought "an unequal distribution and equalization payment, in favor of [Abeir] (60% [-] 40%) which fairly allocate[d] the economic effect of the divorce." It was Mohammed who sought an equal distribution of the marital property.

The superior court considered all relevant statutory factors. Under the first factor the court found that the marriage lasted 19 years. Under the second factor the court found that Mohammed was 54 years old, that Abeir was 47 years old, and that they both struggled with health issues. Under the third factor the court found that Abeir could return to work as a bus driver and that her refusal to do so was unreasonable. The court also found that Mohammed's disability did not prevent him from working as an accountant, which was potentially more lucrative than working as a bus driver.[57] Under the fourth factor the court found that the parties had significant debt when Abeir filed for divorce. The court also found that Mohammed was covered by government health insurance but that Abeir would need to buy her own health insurance. Under the fifth factor the court found that Mohammed improperly revoked Abeir's government health insurance benefits by providing the Egyptian divorce decree to the U.S. Army. The court found the sixth factor irrelevant because the parties had agreed to sell the family home. Under the seventh factor the court considered the fact that it had assigned Abeir sole legal and primary physical custody of the children. Under the eighth factor the court found "no evidence about the time and manner of property acquisition that is

---

[57] Contrary to Mohammed's assertion that the superior court ignored his disability, the court made multiple findings on this issue. The court noted that Mohammed had submitted videos of himself biking and playing with his children and that he could sit for long periods of time during Zoom hearings. The court noted that Mohammed had delayed a neck surgery, but that because the surgery was likely to improve his condition and had a low mortality rate, it was a "personal" decision. The court thus concluded that Mohammed's decision not to do "desk work" as an accountant was unrelated to his disability.

relevant to the equitable division of the marital estate." Under the ninth factor the court found that because Mohammed had been awarded the four-plex, he had an additional source of rental income that was unavailable to Abeir.

The superior court balanced these factors and determined that Abeir was the financially disadvantaged spouse as a result of the divorce. The court noted that she would have less earning capacity and more limited job opportunities, and that she would need to buy health insurance. The court thus considered the relevant law in deciding that a distribution favoring Abeir was equitable. We conclude that this property division was well within the superior court's broad discretion.

E.      **March 2022 Recusal Denial**

Abeir's divorce action was filed in June 2020. Trial was held in July 2021, and the superior court's oral child custody ruling was issued that month, with the divorce decree, final written child custody order, final child support order, and final property distribution order issued in November. Reconsideration motions were decided in March 2022. Not until April 2022, after Mohammed recognized that he was not going to obtain the results he wanted from the trial, did he question the superior court's fairness to the point where the court concluded that he was asking for recusal. Before addressing Mohammed's argument that the superior court erred by not recusing, we will summarize relevant legal concepts.

A judge has a "duty to sit" and not recuse absent valid reasons to do so.[58] Alaska Statute 22.20.020(a)(9) provides that a judge may not act in a matter when the judge "feels that, for any reason, a fair and impartial decision cannot be given." And ethical rules provide that, absent an allowable waiver, a judge shall recuse when "the judge's impartiality might reasonably be questioned, including but not limited to instances where: (a) the judge has a personal bias or prejudice concerning a party or a

---

[58]      *Phillips v. State*, 271 P.3d 457, 468 (Alaska App. 2012).

party's lawyer."[59] Thus, judges "are required to recuse themselves not only if there is actual bias but also if there is the appearance of bias."[60]

Actual bias exists when a "judge's actions 'were the result of personal bias developed from a nonjudicial source.' "[61] But actual bias also may exist when, based on facts presented or events occurring in court, a judge reaches an opinion about a party or lawyer that "is so extreme as to display clear inability to render fair judgment."[62] An appearance of bias arises when a fair-minded person considering the facts and circumstances "would reasonably suspect that the judge's ability or willingness to decide the case fairly would be compromised by the judge's feelings about, or toward" a party or lawyer.[63] A greater showing is necessary for recusal based on an appearance of bias.[64] When a judge is challenged for actual bias, we review the denial of recusal for abuse of discretion, but when a challenge is based on an appearance of bias, we review the denial of recusal de novo as a matter of law.[65] Importantly, "interpretations

---

[59] Alaska Code Jud. Conduct 3(E)(1) (providing that if "the judge's impartiality might reasonably be questioned," then judge "shall disqualify himself or herself.").

[60] *Jourdan v. Nationsbanc Mortg. Corp.*, 42 P.3d 1072, 1082 (Alaska 2002); *see* AS 22.20.020(a)(9) ("A judicial officer may not act in a matter in which . . . the judicial officer feels that, for any reason, a fair and impartial decision cannot be given.").

[61] *Hanson v. Hanson*, 36 P.3d 1181, 1184 (Alaska 2001) (quoting *Nelson v. Jones*, 781 P.2d 964, 972 (Alaska 1989)).

[62] *Id.* (quoting *Liteky v. United States*, 510 U.S. 540, 551 (1994)).

[63] *Phillips*, 271 P.3d at 469.

[64] *State v. Graham*, 513 P.3d 1046, 1070 (Alaska 2022) (quoting *Perotti v. State*, 806 P.2d 325, 328 (Alaska App. 1991)).

[65] *Heber v. Heber*, 330 P.3d 926, 934 (Alaska 2014) ("A judge's decision that he is actually capable of conducting a fair trial is reviewed for abuse of discretion. The separate question whether the judge's participation in a case would lead reasonable people to question his ability to be fair is a question of law reviewed de novo." (Citations omitted.)).

of the law are not sufficient to demonstrate the existence of bias."[66] Likewise, "[m]ere evidence that a judge has exercised his judicial discretion in a particular way is not sufficient to require disqualification."[67] We will "not overturn a judge's [recusal] decision unless it is plain that a fair-minded person could not rationally come to that conclusion on the basis of the known facts."[68]

Mohammed's motion asking the superior court to be "fair & not biased" suggested nearly 20 instances allegedly showing bias. The court issued a 20-page order denying recusal. The court stated that it did not know Abeir's attorney outside of the courtroom and was not involved in IACNVL in any way. The court characterized Mohammed's assertions of bias as "disagreement[s] with this court's rulings on the admissibility of evidence, the credibility of witnesses, factual findings, or substantive legal rulings." The court's order then was reviewed and confirmed by another superior court judge.[69]

Mohammed argues to us that all of the superior court's rulings adverse to him reflect bias and that the court "took it personal" when Mohammed presented the Egyptian divorce decree in an attempt to enforce it. But we see no error in the court's rulings that Mohammed has challenged on appeal — particularly the child custody and marital property division rulings — and Mohammed's complaints about rulings he did not challenge on appeal do not, on their own, support an assertion of bias.[70] There is

---

[66] *Jourdan v. Nationsbanc Mortg. Corp.*, 42 P.3d 1072, 1082 (Alaska 2002).

[67] *Graham*, 513 P.3d at 1071 (alteration in original) (quoting *Sagers v. Sackinger*, 318 P.3d 860, 867 (Alaska 2014)).

[68] *DeNardo v. Maassen*, 200 P.3d 305, 310 (Alaska 2009) (alteration in original) (quoting *Amidon v. State*, 604 P.2d 575, 577 (Alaska 1979)).

[69] *See* AS 22.20.020(c) (requiring review of recusal denial by another judicial officer).

[70] *See Patterson v. Walker*, 429 P.3d 829, 833 n.28 (Alaska 2018) ("[A litigant] cannot rely solely on the court's adverse rulings as evidence of bias.") (alteration in original) (quoting *Pederson v. Arctic Slope Reg'l Corp.*, 421 P.3d 58, 73

no evidence in the record to suggest that the court was biased against Mohammed because of something beyond the courtroom.  Likewise, the court's ruling about the putative Egyptian divorce and comments about Mohammed do not reflect anything beyond the court's understanding of the law and its consideration of Mohammed's conduct when making child custody and property division decisions.[71]  We reject Mohammed's assertions of prejudicial bias on the part of the superior court.

## IV.    CONCLUSION

We AFFIRM the superior court's rulings.

(Alaska 2018)); *Greenway v. Heathcott*, 294 P.3d 1056, 1063 (Alaska 2013) ("[E]ven incorrect rulings against a party do not show bias in and of themselves.").

[71]    *Cf., e.g.*, *Michael M. v. Catherine T.*, No. S-16121, 2016 WL 6134804, at *9 (Alaska Oct. 19, 2016) (noting that most decisions examining judicial officer comments fail to find bias requiring disqualification).